In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00181-CV

AZZ, INC., Appellant

V.

SOUTHEAST TEXAS INDUSTRIES, INC., Appellee

_____

**On Appeal from the 1st District Court**
**Jasper County, Texas**
**Trial Cause No. 36779**

_____

**MEMORANDUM OPINION**

Southeast Texas Industries, Inc. ("STI" or "Appellee") sued AZZ, Inc. (individually, "AZZ, Inc." or "Appellant") and also filed claims against International Galvanizers LLC d/b/a AZZ Galvanizers and d/b/a AZZ Galvanizing – Beaumont and f/k/a International Galvanizers Partnership, Ltd. (AZZ-Beaumont), (collectively, "Defendants"), along with three other AZZ entities, for breach of contract and breach

of warranty, among other things.[1] STI also pleaded alter ego and sought to pierce the corporate veil, but the trial court granted Defendants' motion for directed verdict on alter ego before the case was submitted to the jury.

In this dispute, AZZ, Inc. allegedly failed to properly galvanize pipe for STI, which STI was to supply to Bechtel on two major projects. A central question before us is which AZZ legal entity entered into the agreement with STI for the galvanizing of pipe. Following a ten-day trial, a jury answered "yes" to question 1, "Did STI and AZZ agree that AZZ would galvanize pipe spools provided by STI?" The jury then answered "yes" to question 2, "[d]id AZZ fail to comply with the Contract found in Question 1?" The jury also answered "yes" to question 7, "Was the failure, if any, of AZZ to comply with an express warranty the proximate cause of damages to STI." It should be noted that all the jury questions were prefaced on a definition in the charge that was requested by STI and given by the trial court, over Defendants' objections, that stated "AZZ" refers to "Defendant AZZ Inc. a/k/a AZZ Incorporated."

The jury awarded identical actual damage amounts for each cause of action, $4,539,468.25. In its Motion for Entry of Judgment, STI elected to recover only on the breach of contract claim. The trial court entered a Final Judgment against AZZ,

---

[1]Before trial, STI non-suited the following entities: AZZ GP, LLC; AZZ LP, LLC; and AZZ Group, LP. When the case was submitted to the jury, STI only submitted questions to the jury on their claims against one Defendant, AZZ, Inc.

Inc. only and awarded STI actual damages of $4,539,468.25, attorney's fees through trial of $950,558.50, attorney's fees for post-trial matters of $56,850.00, contingent appellate attorney's fees, pre-judgment interest of $2,414,499.63, and post-judgment interest.

In three issues, AZZ, Inc. argues: (1) there is legally and factually insufficient evidence to support STI's claim for breach of contract[2] because AZZ, Inc. is not the legal entity that had the agreement with STI to perform the Stage 3 galvanization work; (2) the trial court reversibly erred by mischarging the jury when it refused to instruct the jury on any measure of damages for a breach of warranty and improperly defined breach-of-contract damages as "costs . . . related to" the alleged breach; and (3) there is legally insufficient evidence to support the damages awarded by the jury. We hold the evidence was legally insufficient to support the jury's finding that STI and AZZ, Inc. entered into a contract whereby AZZ, Inc. agreed it would galvanize pipe spools provided by STI. Accordingly, we reverse the trial court's judgment and render judgment that STI take nothing by way of its claims against AZZ, Inc. as discussed below.

_____

[2]On appeal, the AZZ Defendants also make similar arguments as to the legal and factual sufficiency of the jury's findings relating to the alleged breach of warranty claim, but because STI elected to recover a judgment solely on the breach of contract claim, we will discuss the breach of warranty claim only when necessary to our ruling. *See* Tex. R. App. P. 47.1 (appellate court must hand down a written opinion as brief as practicable that addresses ever issue necessary to the appeal's final disposition).

## I. BACKGROUND

**Parties' Relationship[3]**

STI had an agreement with Bechtel Corporation ("Bechtel") on two "mega" projects to supply fabricated pipe spools for: (1) the Sabine Pass Liquefaction Project; and (2) the Corpus Christi Liquefaction Project. The pipe had to be galvanized, and Bechtel's purchase orders and specifications issued to STI for each project specified that standard specification ASTM A123 applied to the pipe galvanization. STI's project manager, Henry Glaser testified that he "reached out to AZZ to get them to quote galvanizing." Glaser said he did so "because [of] their proximity there in Beaumont" and "the fact that they have multiple locations spread all over the United States, they're essentially the biggest game in town." Glaser testified that STI had already used AZZ for Stages 1 and 2 of the Sabine Pass Project, and there were no issues from that work.

In 2015, in response to STI's inquiry, Henry Netherland, the AZZ Galvanizing – Beaumont plant manager, submitted a cover letter on "International Galvanizers

---

[3]Often, in the pleadings and in the record of the trial, there is a reference to "AZZ" generally without specifying whether it is a reference to "AZZ, Inc." or "AZZ Galvanizing – Beaumont." In our summary of the background and evidence at trial, when the parties, testimony, or other evidence failed to specify a particular AZZ entity, we will also use "AZZ." When a particular AZZ entity was referenced, we will also do so.

Partnership Limited" letterhead as shown below with a manual attached entitled "AZZ Galvanizing Services Quality Program Manual."



STI, in turn, submitted the materials to Bechtel, who stamped it "Code 1," which meant it approved the procedure for use in the galvanizing. The AZZ Galvanizing Services Quality Program Manual submitted by Netherland outlined the various inspection processes and specified that galvanization would be performed in accordance with ASTM A123. Similarly, the record shows that the AZZ Galvanizing Services of Houston Sales Manager Mike Bond responded to STI's galvanizing inquiry with two documents. The first document Bond sent had the following logo:



Bond signed the document as "AZZ Houston Sales Manager." The correspondence stated that "AZZ provides hot dip galvanizing services throughout the United States and Canada, operating 36 facilities." The second document Bond submitted was on the same letterhead Netherland used:



The second document noted it was a "[r]esponse to procedural inquiry[.]" It stated that the galvanizing procedures would comply with ASTM A123, among others, and that repairs would be made per ASTM A780. Bond signed the second letter as the "Sales Manager" for "AZZ Galvanizing – Beaumont."

Once Bechtel approved the use of the AZZ galvanizing procedure, STI submitted various purchase orders to "International Galvanizers," which is the Beaumont facility, for galvanized approximately 1900 pipe spools to be delivered to AZZ in Beaumont by STI, then "International Galvanizers" in Beaumont invoiced STI, and STI paid for the galvanizing. Each of the invoices sent to STI is from AZZ-Beaumont (International Galvanizers/AZZ Galvanizing – Beaumont) and directs that payment be remitted to "International Galvanizers." The first purchase order for "original galvanizing" or "original galvanization"[4] for the projects was issued by

---

[4] Throughout this opinion, we use "original galvanizing" or "original galvanization" to refer to the first galvanization of the pipe spools that occurred at the AZZ Galvanizing – Beaumont facility between late 2015 and early 2017. When we use "regalvanizing" or "regalvanization," we refer to subsequent galvanization of the same pipes to remedy the alleged defects in the original galvanization, which occurred at various AZZ facilities, including AZZ Galvanizing – Beaumont.

STI to International Galvanizers in Beaumont in early 2016. The original galvanization continued until early 2017.

Appellant contends the entity that agreed to galvanize the pipes was International Galvanizers LLC, which operated under the d/b/a names "AZZ Galvanizers" and "AZZ Galvanizing – Beaumont," and Appellant argues there is no evidence in the record that supports a finding that AZZ, Inc. is the legal entity who agreed to galvanize the pipes. In contrast, Appellee contends that direct and circumstantial evidence supports the finding that AZZ, Inc. is the legal entity who agreed to galvanize the pipes through its agents, Beaumont Plant Manager Henry Netherland and Regional Sales Manager Mike Bond. STI points to the fact that after the problems arose with the stage three galvanization, Bernardo Duran, a metal coatings engineer employed by AZZ, Inc., became involved to provide recommendations for resolving the dispute and that Duran sent his report to "AZZ Vice President Mike Delesandri, AZZ Southeast Regional Manager Bobby McKinney, and AZZ Regional Sales Manager Kevin Houston." STI contends these "AZZ representatives, along with Beaumont personnel, were 'directly involved with the project.'"

According to the record, Bechtel rejected about 1500 pipe spools for defective galvanization, and STI alleged it had to correct the problem by having AZZ regalvanize the pipes.

**Pleadings and Parties' Claims**

STI sued several AZZ entities, including AZZ, Inc. and AZZ-Beaumont and other AZZ entities in its last live pleading, the third amended petition, for its remediation costs, amounts Bechtel back charged it, and attorney's fees, among other things. In the live petition, STI alleges that it "contracted and retained the services of AZZ Inc. a/k/a AZZ INCORPORATED, AZZ GP, LLC, AZZ LP, LLC, AZZ GROUP, LP and/or INTERNATIONAL GALVANIZERS PARTNERSHIP, LTD. d/b/a International Galvanizers d/b/a Aztec Galvanizing d/b/a AZZ Galvanizers Partnership, Ltd. d/b/a AZZ Galvanizing – Beaumont," which STI collectively referred to as "AZZ." STI pleaded that AZZ represented it could galvanize the pipes and that its work would meet or exceed the specifications. STI asserts that based on AZZ's representations, Bechtel approved it to provide the galvanizing services and materials for the projects' pipe spools.

STI alleges that AZZ made representations about its "rigorous" inspection protocol. STI claims that despite these representations about AZZ's inspections and its written policies, "AZZ never notified" it or Bechtel of any problems with the pipe spools before, during or after galvanization. STI claims that it relied on "AZZ's . . . various representations" and that "AZZ failed to comply with its own Quality Program," so STI accepted and, in some cases, installed the pipe.

According to STI, after installing the pipe, STI or Bechtel discovered "numerous material defects in the galvanizing performed by AZZ." Bechtel required STI to cure the defects by removing the pipe and sending it back for regalvanization, then shipping it back for reinstallation, with those costs "either being borne directly by [STI] or being back charged and/or assessed to [STI] by its customer, Bechtel." STI asserts that although "AZZ" agreed to regalvanize some materials at its cost, STI bore the "vast majority" of these costs.

STI alleges that upon pressing, "AZZ finally" agreed to regalvanize some pipe at "a different facility." STI claims that based on its contractual obligations with Bechtel, it incurred "substantial damages in curing AZZ's defaults and defective galvanizing[.]" According to STI, these damages included continued "charges from AZZ," hiring its own quality-control experts to inspect materials, the costs of reinstallation, freight, back charges and assessments from Bechtel.

STI alleged causes of action collectively against all AZZ Defendants for: breach of contract; breach of express warranty for services; negligence; negligent misrepresentation; and alter ego/piercing the corporate veil/joint and several liability. In conjunction with its breach of contract claim, STI alleges that it "and AZZ had a valid and enforceable contract for AZZ's galvanizing services and materials." STI asserts that it fully performed under the contract, but "AZZ defaulted" by "failing to provide the agreed-upon and requisite galvanizing services and materials suitable

9

and acceptable under the agreed-to specifications and standards." It claims that these acts constitute the "producing cause" of STI's damages. STI alleges that "[b]ecause of AZZ's breach of contract," it is entitled to damages, including direct, consequential, benefit of the contract and benefit of the bargain, attorney's fees, and costs.

In the petition, STI alleged alter ego, veil-piercing, and joint and several liability theories, arguing, among other things, that "AZZ Inc. a/k/a AZZ Incorporated ("AZZ Inc.") is liable for the conduct of its subsidiaries which are mere tools or business conduits of AZZ Inc. and agents of their principal AZZ Inc." It sought to disregard the corporate form of AZZ Inc.'s subsidiary entities.

The Defendants answered with a general denial, a verified denial, and various affirmative defenses. The Defendants pleaded that "International Galvanizers Partnership, Ltd. converted to International Galvanizers LLC, a Texas limited liability company on August 31, 2018." They also specially excepted, complaining that STI references all the entities "collectively," fails to separate or differentiate any alleged conduct to a particular defendant, and STI's pleading fails to give fair notice of which entity engaged in which conduct.

AZZ-Beaumont (International Galvanizers LLC d/b/a AZZ Galvanizers d/b/a AZZ Galvanizing – Beaumont) filed its own counterclaim against STI. In the counterclaim, AZZ-Beaumont alleges it offered to compromise and regalvanize the

rejected pipe for the Bechtel project, and in essence, formed a new contract, which it referred to as the "Moving Forward Agreement." It asserts that it offered to regalvanize rejected straight run pipe at no cost to STI, but it would require STI to pay to regalvanize pipe with 90-degrees or bends. According to International Galvanizers, STI agreed to this proposal but failed to pay International Galvanizers after being invoiced $134,836.57 and applying credits, and STI still owes it $72,524.17. International Galvanizers pleaded the following causes of action: suit on sworn account; breach of contract; promissory estoppel; quantum meruit; and setoff and recoupment.

In its Amended Answer to Defendant's Counterclaim, STI asserts a general denial, specific denials, and affirmative defenses. Among other things, it asserts a "failure of consideration for the alleged contract forming the basis of IGP's claims [] because IGP had a pre-existing obligation to correct its defective work and therefore the services it performed pursuant to IGP's Alleged Contract were not proper consideration." It also responds that there was only one contract between the parties, and it is the one in STI's live petition known as the "Galvanization Contract."

11

## II. TRIAL PROCEEDINGS AND EVIDENCE

**Testimony of Jimmy Glaser**

Jimmy Glaser testified that he has worked for STI for twenty years and is a project manager. He said the two projects at issue were for Bechtel. STI bid for the first stage of the project in 2012 and was involved in all three stages of the projects. They began negotiations with Bechtel in 2012, the purchase order was issued in December 2012, Bechtel began shipping raw materials to STI early in 2013, and fabrication began "in earnest" around June or July 2013. Glaser said that on the Sabine Pass project, STI performed some of the piping in Stages 1 and 2, and that "AZZ was our galvanizer throughout the entire program." In the first two stages, there "were no major issues that were cause for concern" with the galvanization. According to Glaser, STI began fabricating pipe for Stage 3 of the Sabine Pass project at the end of 2015 and started shipping pipe to the site in early 2016. Glaser testified that STI entered an agreement with Bechtel to do Stages 1 and 2 of the Corpus Christi Project, and STI hired AZZ to perform the galvanization for Stages 1 and 2 of that project.

Glaser indicated these were exceptionally large projects involving billions of dollars, so time was of the essence. Glaser testified that Bechtel issued purchase orders to STI for the Corpus Christi Project and Sabine Pass Project containing the agreement between Bechtel and STI, which were both admitted into evidence.

12

Glaser negotiated both agreements with Bechtel for STI. Glaser noted the award date for the Corpus Christi Project was June 1, 2015, and the award for the Stage 3 Sabine Pass Project was September 30, 2015. Glaser testified the terms of the agreement for the Sabine Pass Stage 3 Project were the same as for the Corpus Christi Project.

Per the agreements, Bechtel was the Buyer, and STI's work was subject to Bechtel's inspection. Before any STI subcontractor could work on the projects, the subcontractor had to submit its procedures for how it would do the work, which STI then sent to Bechtel for approval. Bechtel then assigned a procedure code, and the Bechtel "Code 1" stamp meant the subcontractor could proceed with the work exactly as outlined in the submitted procedure.

According to Glaser, STI had two agreements with Bechtel for these projects, then STI entered into an agreement with AZZ regarding both of those projects. Glaser testified,

> I reached out to AZZ to quote the galvanizing for us; and, actually, they were the only ones that I reached out to because their proximity there in Beaumont and also the fact that they have multiple locations spread all over the United States, they're essentially the biggest game in town.

Glaser testified that AZZ submitted its galvanizing procedure to STI, which STI then sent to Bechtel. The document shows it was submitted in July 2015 with a cover letter from Henry Netherland as Plant Manager of "AZZ Galvanizing – Beaumont" in response to a procedural inquiry. The letter explained it would serve as an

13

addendum to "AZZ Galvanizing Services Quality Manual." Netherland submitted the letter on the following letterhead:



The next page contained the same "AZZ Galvanizing Services" logo at the top with the "Quality Program Manual" immediately underneath. Glaser explained that Bechtel stamped AZZ's procedure as "Code 1," which meant Bechtel agreed with the procedures and allowed AZZ to proceed with the work. It was the same procedure followed in Stages 1 and 2 on the Sabine Pass Project.

Glaser testified that the procedure manual lists all AZZ locations, and STI expected AZZ to follow the process outlined no matter which AZZ location did the work. STI expected AZZ to inspect the material upon delivery at AZZ's facility and report any damage, but AZZ never reported any damage to STI.

Glaser testified that STI had "no significant issues" with AZZ's work on Stages 1 and 2 of the Sabine Pass project. In contrast, there were significant problems with Stage 3, although the scope of work was the same as Stage 1 and 2. STI realized too late that the inside of the pipe was not galvanized properly; there were bare spots, ash, and dross inclusions.

14

Glaser testified that in early 2016, the original galvanization work occurred for the Sabine Pass Stage 3 Project and the Corpus Christi Project with the work happening "concurrently[,]" and it continued until early 2017. Glaser said around August 2016, they received the first Deficiency Report from Bechtel noting a problem with the pipe galvanization. In April 2017, STI first discussed regalvanization with AZZ, and through the end of 2017, the regalvanization occurred. According to Glaser, Bechtel's specifications incorporated the ASTM standards for hot-dipped galvanization, which AZZ was supposed to follow.

On Stage 3 of the Sabine Pass and Corpus Christi Projects, they had issues with flux and ash inclusion in the galvanization, which was a reason Bechtel rejected AZZ's galvanization. According to Glaser, AZZ's process indicated that major uncoated areas or bare spots were cause for rejection and would be repaired according to ASTM A780, which is what happened here once Bechtel caught it. According to AZZ's procedure, ASTM A123 was the standard AZZ was supposed to follow. Glaser testified that AZZ's manual required AZZ to perform multiple inspections during the process, and STI expected AZZ to do so.

Glaser said that although the original galvanization of pipe spools on the first two stages at Sabine Pass met STI's quality expectations, it did not on Stage 3 for Sabine Pass nor for the Corpus Christi Project. Although the same specifications applied to the work, Glaser noted that when the work began, STI worked with Henry

15

Netherland at AZZ, then Steve Shepard at AZZ, then Darrian Wright took over at AZZ as plant manager. According to Glaser, it seemed many of these problems happened during Wright's tenure as manager.

Glaser said that in April 2017, he let AZZ know that Bechtel reported problems; Bechtel believed all non-straight run pipe spools had potential problems. Bechtel wanted STI to send a representative to the site to inspect all the galvanized pipe in the laydown yard. Glaser testified that STI sent Cody Garrett and a few others to inspect the pipe in the laydown yard. According to Glaser, the issue with the galvanized pipe began really becoming known in March and April of 2017. STI received several Deficiency Reports from Bechtel during this time, rejecting the pipe. Once Bechtel returned the pipe to STI's yard, Glaser personally inspected "hundreds of spools." He personally observed the problems with the pipe, which were visible to the naked eye.

Glaser said that on April 17, 2017, STI's pipe fabrication manager, Jerrold Gill, sent a letter to Kevin Houston at AZZ. The letter notes the vendor as "AZZ Galvanizing." In the letter, Gill told Houston there were galvanizing issues with 300 pipe spools, STI was returning the spools for repairs, and STI requested a meeting. The requested meeting between STI and "several representatives from AZZ" occurred, including Houston, Wright, and McKinney. Glaser testified that everyone agreed they needed to do whatever was necessary to make Bechtel happy, and STI

would be "sending spools back to AZZ." Glaser said that AZZ was "on board with" the plan and wanted to help. Glaser testified that AZZ agreed to regalvanize those 300 spools and confirmed this occurred after the original galvanization. Glaser discussed STI's communications with AZZ and Bechtel regarding the problems with the pipes and the plan for fixing them. This included communications with Houston from AZZ, who was a "regional sales" person and "heavily involved."

Glaser also discussed an email from AZZ's Bernardo Duran dated April 26, 2017, to other AZZ employees, including McKinney, identifying and explaining issues seen in the pipe photographs. Duran recommended remediation steps, including regalvanizing certain pipes with bare spots. Duran's email signature block contained "AZZ Metal Coatings" and noted he was a "Coatings Performance Engineer." Glaser testified that "Duran was an employee from AZZ that was brought in" and "was more of an expert and was able to offer some direction."

Glaser said that on May 10, 2017, he emailed AZZ's McKinney, among others, requesting formal documentation for "AZZ's stance" on the noted issues with the galvanized spools for the two Bechtel projects. STI's senior management and Bechtel's senior management wanted "AZZ on board with the overall process of fixing the issue and get their buy-in." According to Glaser, STI tried to work with AZZ to fix the problem. The email shows that McKinney responded the same day regarding repairs to the pipe indicating they would "continue to rerun the material"

17

with "bare spots on the [internal diameter]." Neither the May 10 email nor Glaser's testimony indicated that McKinney worked or acted as a representative for AZZ, Inc. Glaser's email to McKinney shows that it was sent to an "azzgalv.com" email address. A report dated May 1, 2017, attached to the email referenced the two projects and stated that a Bechtel coating specialist travelled to "STI and AZZ Galvanizers in Beaumont" to inspect the pipe.

Glaser said that on May 11, 2017, McKinney responded to Glaser's email with a letter. McKinney's letter was on "AZZ Beaumont" letterhead and said it was from "Bobby McKinney Jr. c/o AZZ Galvanizing." Glaser told the jury that in the letter, McKinney outlined AZZ's position, which was that most bare spots on the pipe's interior were due to the design. McKinney also attributed the bare spots to insufficient blasting, which AZZ raised on very limited quantities previously and that STI already addressed. Glaser felt that AZZ was making excuses.

Glaser testified that by June 2017, STI had received "a lot of pipe spools back from Bechtel" to remediate. On June 6, 2017, AZZ's Beaumont Plant Manager, Wright, reached out to STI's Garrett via email. Wright said that going forward, AZZ would regalvanize pipes with bare spots on the 90-degree sections or at connections, but STI would bear the cost. Yet, "AZZ Beaumont" would be responsible for reprocessing straight pipes with large or inaccessible bare spots and specified that

18

"AZZ Beaumont" would use zinc solder to repair certain spots. Wright's email had the following signature block over a logo:

> Darrian Wright
> Plant Manager
> AZZ Galvanizing – Beaumont
> [Phone Numbers]
> 5898 Industrial Rd, Beaumont, Texas 77705
> Darrianwright@azzgalv.com



Glaser testified that Garrett responded to Wright via email on June 9, 2017, but Glaser denied that response was an agreement by STI to pay for the regalvanization. According to Glaser, Garrett's June 9, 2017, response only showed that STI assigned two separate purchase orders to track items that AZZ refused to reprocess. When asked if this was a new agreement, Glaser responded, "It's just the tracking of the information on these two jobs." Glaser testified that STI had already paid AZZ one hundred percent for the original galvanization.

According to Glaser, STI paid for the regalvanization of pipes with bends until AZZ completed most of the regalvanization work, because AZZ refused to regalvanize without STI paying. Glaser noted a liquidated damages clause in STI's contract with Bechtel and claimed that AZZ refused to reprocess unless STI paid again. Glaser testified that "AZZ is the biggest galvanizer around. They're the only

one that's local to us, and so we're kind of stuck[.]" Glaser explained that by July 2017, AZZ had a process in place to regalvanize all the spools, which occurred over four plants in three cities. During Glaser's testimony, he discussed an email from McKinney to Garrett in July 2017, where McKinney outlined the procedure for the rework and indicated four plants in Beaumont, Houston, and San Antonio would be handling the rework. McKinney signed the email as the South Texas Regional Manager of "AZZ Metal Coatings."

Glaser said that there were approximately 1900 galvanized pipe spools, and 1500 had to be regalvanized. He estimated 800 to 900 spools for each project had galvanization issues, and Bechtel rejected the vast majority. According to Glaser, ASTM A123 was the applicable standard, as provided in AZZ's approved procedure.

During his testimony, Glaser discussed invoices issued on the projects from "AZZ Galvanizing Services" requesting that STI remit payment to "International Galvanizers," and the product shipped to STI. When asked whether AZZ Beaumont's name was International Galvanizers, Glaser said he never dealt with International Galvanizers, and he believed that was the facility's name before his time. Glaser testified, "I've always dealt with AZZ. That's who I hired."

Glaser specified that STI paid AZZ about $472,000 for the original galvanizing. Glaser testified that STI hired AZZ to galvanize the pipe and to perform

inspections, which was in AZZ's manual. According to Glaser, STI thought AZZ would inspect the pipe according to the procedure.

Glaser explained why STI sued AZZ. Glaser testified that STI's owner spent "millions of dollars" out of his pocket to make the client whole, and with the lawsuit, "we're simply trying to recoup that[.]" Glaser also discussed the purchase order tracking amounts assigned under the June 9, 2017 email, and he discussed an exhibit reflecting rework amounts billed to STI and billed to "AZZ—Beaumont." During Glaser's testimony, regalvanization invoices were admitted into evidence which had an "AZZ Metal Coatings" trademark logo at the top noting that payment should be remitted to "International Galvanizers," "North American Galvanizing Company," or "AZZ-Galvanizing – San Antonio."

**Testimony of Jerrold Gill**

STI's Piping Director, Jerrold Gill, testified that he has worked for STI for twenty-nine years. During these projects, about 500 employees reported to him. Gill is responsible for "everything that goes through the pipe shop, including safety, quality, and personnel." Gill assigns the project managers, who become the main point of contact for the customers, but if there are problems on the job, Gill gets involved. Gill reported directly to STI's owner.

Gill explained that the "AZZ Galvanizing Procedure" for the Corpus Christi Liquefaction Project stamped as Code 1 by Bechtel became a part of STI's

21

agreement with AZZ. He testified that AZZ performed galvanizing services for STI on this project, and he expected AZZ to follow that procedure. These projects involved Stage 3 work, but STI used AZZ on the first two stages, which involved the same procedures. Gill believed these pipes were galvanized under ASTM A123.

Gill testified that

AZZ . . . used to be International Galvanizers that was in Beaumont; and that's who everybody in the area used. Well, now they've bought everybody else just about so they're [] the biggest player on the block. So if you've got a major mega project, that's typically who you're going to go to [] get any kind of galvanizing done. There's just not a lot of other people that can produce as much as they can.

The first purchase order for Stage 3 between STI and AZZ for the delivery of pipe was issued in January 2016.

Gill testified that STI Project Manager Cory Garrett discussed AZZ Plant Manager Darrian Wright's June 6, 2017, email with him regarding the proposed payments for regalvanizing the pipes. He testified that Garrett's June 9, 2017, response was only an agreement to track costs. Garrett's email did not state that he accepted nor did it discuss labor costs or money. Gill said he decided not to pay AZZ's last regalvanizing invoice.

During his testimony, Gill described photographs of some pipe spools at issue and said he observed the problems depicted in the photos, including bare spots. When Gill first learned of problems, he sent Garrett and Glaser to the Sabine Pass site. When they arrived, they told Gill they had a bigger problem, because some of

the pipe was already being installed. The installers began observing bare spots and wanted to remove the pipe, but Gill tried to mitigate that, so he obtained a tractor camera to view the inside of the pipe. Gill testified that once he saw bare spots, he could not defend it, because there was not galvanized coverage.

Gill agreed that STI should have inspected the pipe, and if STI saw any problems, it should not have delivered the pipe to the customer. That said, STI inspected all the pipe on the first stages of the job and had "hundred percent coverage[,]" so they only performed spot inspections at this stage. AZZ also told Gill that it was inspecting the pipe. He agreed that Bechtel was obligated to inspect the pipe, too. Gill testified that STI had to timely notify AZZ of any issues STI wanted corrected, and he notified AZZ as soon as he knew. He said that AZZ acted in "bad faith" when it did not finish the job.

According to Gill, on the earlier stages of the Sabine Pass and Corpus Projects, STI did not have problems with AZZ's work. The specifications were the same, but management changed at the Beaumont AZZ facility, and "they didn't take care of it." STI used the same galvanizing facility previously without problems, and the only difference Gill observed was AZZ's management team. For the regalvanization, STI used multiple AZZ facilities, including Beaumont, Houston, and San Antonio, but he only observed problems with the work at the Beaumont facility. According to

Gill, as the world's largest galvanizer, AZZ was the subject matter expert, which is what he assumed when STI gave the purchase order.

Gill said that STI had to get all the material regalvanized, and STI paid for most of the regalvanization, which he disagreed with, because STI had already paid for it once. He explained they paid it because AZZ refused to regalvanize unless STI paid. According to Gill, AZZ is the largest galvanizer in the country, which is why he went there, and he could not have completed the rework without them. According to Gill, the liquidated damages clause was 1.5 percent of the total contract value, which STI had to pay if AZZ did not regalvanize the pipe, so STI paid to regalvanize it. Gill testified, "I trusted my subcontractor[,]" and insisted that AZZ did not do its job. Gill explained that because of the regalvanization delays, Bechtel back charged STI, but STI negotiated to reduce the back charges.

**Testimony of Shannon Cloud**

Shannon Cloud testified that she is STI Group's Controller, which includes STI and its sister field service company, STIS. She is responsible for all financial transactions, including accounts payable, billing and payroll.

Cloud spent much of her testimony discussing STI's "Job Detail Reports" and supporting documentation. STI's "Job Detail Reports" covered in Cloud's testimony tracked the rework for both projects and showed galvanizing vendors listed as "Aztec Galvanizers" and "International Galvan." Cloud testified that Plaintiff's

24

Exhibits 95 and 101 are the job cost reports for each project, which are summaries containing all the relevant information in them, and the additional exhibits admitted are the supporting documentation for those job cost reports.[5]

Additional exhibits showed invoices from other trucking vendors that STI paid, including items retrieved or shipped to various "AZZ Galvanizing" or "AZZ Galvanizers" locations for rework. She testified that STI Exhibit 100 were the "AZZ invoices." Those "AZZ invoices" did not list "AZZ, Inc." or "AZZ Incorporated." Rather, they showed the vendor as "Aztec Galvanizers," "AZZ Galvanizing – San Antonio" or "International Galvanizers," among others.

Cloud discussed STI's "AP Open Invoice Report," which she prepared. The report lists invoices STI received but were unpaid. This report created by STI identifies the vendor as "International Galvanizers" and attaches a series of invoices, none of which are from AZZ, Inc. or AZZ Incorporated. Cloud testified that she was instructed not to pay these invoices. She explained that the project manager requests that purchase orders be issued, and she "verif[ies] that the invoices match what we asked for."

**Testimony of Robert Iezzi**

Robert Iezzi testified that he received a degree in engineering with a chemical specialty in 1965. He has a master's degree in physics, and a Ph.D. in metallurgy

---

[5]The exhibits reflect that the title of the documents is "Job Detail Report."

and material science. Iezzi described his work experience, including involvement with galvanizing, for the jury.

He described the materials he reviewed in this case, including the relevant Bechtel specifications, three AZZ quality manual procedures, and various other documents and videos. Iezzi testified STI asked him, based on his review of that information, to analyze whether the product produced by AZZ met those specifications. He reviewed Bechtel's Deficiency Reports and Nonconformance Reports with attached photographs. He estimated he reviewed 5,000 photographs and thirty videos.

Iezzi testified that AZZ's Quality Program Manual had a Bechtel "Code 1" stamp on it, which meant Bechtel accepted the document. He explained that Netherland, the AZZ Galvanizing Plant Manager from Beaumont, sent a cover letter noting it was in response to a procedural inquiry and that AZZ agreed to galvanize under ASTM A123. He said that AZZ's own quality control documents indicated the plant manager was responsible for ensuring all materials were properly galvanized. Per the manual, the Senior Vice President would be responsible for the overall operation of the services segment, whereas the Galvanizing Divisional Vice President is responsible for the administration, customer relations, safety, and quality of the plant under their division. Reading from the manual, Iezzi noted that the Galvanizing Regional Manager is responsible for the administration, customer

26

relations, safety, and quality of the plant. Finally, he stated that the manual outlined, "Plant Manager's responsible for administration, customer relations, and so on, safety, and quality of service and coating. He is responsible for seeing that all materials are galvanized in accordance with the applicable specifications. He is responsible for inspections on all galvanized material."

**Testimony of Darrian Wright**

Darrian Wright testified his "first job was at AZZ" in environmental, health, and safety. From August 2015 until October 2016, he had no role or responsibilities with galvanizing. Between October 2016 and March 2017, he was the operations manager in Beaumont. In March 2017, Wright became the Beaumont Plant Manager and was in that role until August 2018.

Wright did not recall how STI first contacted AZZ for the projects. He thought he was involved toward the end of the projects. He testified that AZZ and STI entered into an agreement for galvanizing on the projects. Wright did not recall the galvanization specifications STI wanted on the projects or whether he was part of that process. He testified that he could not recall specifics about these projects but knew that AZZ galvanized for these projects. Although Wright could not recall specifics, he did not think AZZ did anything wrong on these projects.

27

**Testimony of Paul Spence**

STI's owner and CEO, Paul Spence, testified that once Bechtel asked STI to pick up the pipe, he and other STI employees examined it in their shop and observed "bare spots on the inside of the pipe." Spence said that he saw bare spots on the inside of the pipes with the naked eye.

Spence testified that STI has worked on various projects for Bechtel since 2010, primarily fabricating pipe. STI also worked with AZZ before these projects, which went back to International Galvanizers. He testified that he did not recall when AZZ bought International Galvanizers, but STI continued to do "a lot of work" with AZZ.

According to Spence, STI hired AZZ to inspect, clean, and galvanize the inside and outside of the pipe spools. STI paid AZZ for all the original galvanizing. He said the pipe spools for Stage 1 and 2 were "mirror imaged" of Stage 3, but there were no problems with those. Spence explained that AZZ performed the original galvanization on Sabine Pass Stage 3 and Corpus Christi in 2015, and it continued into early 2017.

Spence testified that on April 6, 2017, Glaser notified Houston and Wright with AZZ that they were receiving complaints from the site about the pipe, and STI was sending a representative to review all the spools in the laydown yard. After a site visit, STI employees reported to Spence that Bechtel had valid concerns about

28

the pipe spools and confirmed "problems with the galvanizing." Spence discussed an April 26, 2017, email from AZZ's Duran to Houston, McKinney, Delesandri, and Wright and testified, "I assume they're all with AZZ." According to Spence, AZZ acknowledged there were bare spots that did not meet the specifications. Spence claimed that AZZ has not admitted that it failed to meet the specifications, and he spent $4.5 or $4.8 million to "fix this mess."

AZZ wanted Spence to pay for regalvanizing the pipes, and he paid for some of it. Spence explained that he paid AZZ, because around June 2017, Gill told him AZZ was "refusing to continue the redipping process unless we pay them." So, Gill was afraid if STI did not pay, AZZ would shut them down with Bechtel, and STI would be unable to return the pipes in the required time. Spence felt he was "over a barrel."

Spence discussed documents which he said show AZZ knew there were issues with the pipe but was unwilling to reprocess them. Under the Bechtel contract, if STI failed to fulfill its obligation, Bechtel would enact liquidated damages plus back charge STI. Spence testified that liquidated damages would have been $2.5 million, but if Bechtel did all the remediation work or subcontracted it out, it would have been "as high as $8 million."

Regarding Garrett's June 9, 2017, email, Spence disputed that STI agreed to pay AZZ for reprocessing the pipe spools and simply said STI would "track costs."

29

He testified that after the email, STI paid to reprocess some pipe spools, but "[o]nly to the extent that we had to keep it going." STI stopped paying AZZ to reprocess the pipes in July or August, because of mounting costs, and they already paid AZZ once. He explained that before then, the original galvanization was done, and AZZ was on notice of the problems.

Spence asked the jury to award $4,789,482.21, which he claimed was the amount STI spent to have AZZ's pipes removed, regalvanized, and replaced. He testified that Bechtel's complaints about AZZ's galvanizing work were correct, and the galvanized pipe spools he personally observed were "100 percent defective" and "needed to be redipped."

Spence said that the original galvanization work was done at AZZ Beaumont. He testified that STI hired AZZ to galvanize these pipe spools according to ASTM A123; in some instances, AZZ complied with ASTM A123, and in some instances they did not. Spence agreed that not all bare spots are rejectable. According to Spence, the only change that occurred in Stage 3 was the leadership in the Beaumont AZZ plant. He noted that Wright became operations manager there in October 2016, then became plant manager as the work was regalvanized. AZZ sent the regalvanization work to four plants.

**Testimony of Bobby McKinney**

Bobby McKinney testified that he is AZZ's corporate representative. McKinney felt that AZZ complied with ASTM A123 for every spool in this case, but that did not mean they were all galvanized perfectly. He explained that AZZ "did strive to comply with ASTM 123[.]" McKinney said he was the AZZ Beaumont plant manager from September 2003 until March 2013, then he was the regional manager until 2017. As a regional manager, McKinney had several AZZ plants under him, including the Houston plants, the Beaumont plant, and San Antonio plants. McKinney is currently the Beaumont plant manager and explained how he transitioned back to that role.

For these projects, AZZ galvanized over 1900 spools for STI, and between June and October 2017, AZZ regalvanized 1501 of those. AZZ did not charge to regalvanize 430 spools but did charge for 1,071. McKinney provided a breakdown of which AZZ plants regalvanized these spools. He testified that the other plants billed them to "AZZ Beaumont." According to McKinney, STI eventually stopped paying for the regalvanizing and still owes AZZ $72,525.00.

McKinney testified that there was not a written contract between AZZ and STI, but AZZ followed the Bechtel specifications, which incorporated ASTM A123. McKinney testified that Netherland, as the Plant Manager, sent a letter in July 2015 responding to a procedural inquiry and forwarding the "AZZ Galvanizing Services

31

Quality Program Manual." The letter specified it was an addendum to the manual and specified that the galvanizing would be done per ASTM A123 plus addressed the need for abrasive blasting before galvanizing. In conjunction with this correspondence, McKinney described Netherland "as a[n] agent of the company."

McKinney was asked about an internal email from Bernardo Duran, AZZ's internal coatings engineer, which references the "contracts [Netherland] and Mike Bond agreed to during the start of the STI/Bechtel project[,]" and states that STI's Garrett "previously sent me an email with the contracts." Duran's email then attaches Garrett's email containing the following documents: the Corpus Christi specifications; Bond's letter on AZZ Galvanizing Services Houston letterhead with a "Code 1" Bechtel stamp discussing Special High Grade zinc used by the Houston facility; Netherland's letter regarding the galvanizing procedure referencing ASTM A123, the Bechtel specifications, and stating the letter serves as an addendum to the "AZZ Galvanizing Services Quality Manual;" and the "AZZ Galvanizing Services Quality Program Manual." He confirmed the contents of Duran's email but explained that while they have thirty-six facilities, the "Houston facility uses only special high-grade zinc." He explained that regarding the "special high-grade zinc," Bond's letter "calls out the Houston facility" but "doesn't call out any of the other facilities." McKinney characterized Bond's letter as "mirroring" the quality manual by discussing how AZZ verified incoming orders against packing lists, and noted

32

that Bond's letter explains the Houston's facility's use of "hydrochloric acid rather than sulfuric acid[.]"

McKinney explained that Netherland was the AZZ Beaumont plant manager during Stages 1 and 2 of Sabine Pass, but Shepard and Wright were the plant managers during Stage 3. He explained that Wright became the AZZ Beaumont plant manager in March 2017, and most of the work was done before then. Wright was the plant manager during the regalvanization.

McKinney described the galvanizing process and the various inspections along the way. He testified that there is a "QA/QC sheet" that they fill out on the completed order. McKinney explained that they completed a QA/QC sheet for every load; they visually inspect the product with the naked eye, which complies with ASTM A123.

McKinney testified that AZZ followed ASTM A123 for the whole project, and AZZ followed all its Quality Manual standards, including performing its Galvanizing Inspection Checklist and its other inspections. According to McKinney, they completed a "Visual Inspection Check List" for every pipe spool load, but if the bare spots cannot be seen with a visual inspection, then the material is not rejectable under ASTM A123. McKinney explained that if AZZ inspected the pipe but could not see issues during the inspection, it still complied with ASTM A123, Bechtel's specifications, and AZZ's quality manual. He said that Bechtel was given

"carte blanche to decide what they wanted and what they didn't want" and returned material that was not rejectable per the specification. McKinney testified that, after the fact, Bechtel found bare spots, which do not comply with ASTM A123. He noted that once the bare spots were found, AZZ remediated them pursuant to ASTM A123 and 780.

He said that STI had no basis to claim that AZZ failed to meet its agreed-to obligations, but AZZ could claim that STI failed to pay AZZ $72,000 for remediation work. McKinney testified that AZZ complied with the agreement, but STI did not comply by failing to (1) sufficiently blast the interior of the pipe, and (2) pay for the rework it agreed to pay. According to McKinney, AZZ made STI "pay for what was not our issue."

During his testimony, McKinney went through many pictures, described what he saw, and explained why the material was not rejectable under the applicable standards or how AZZ could have remediated in the field if given a chance. McKinney testified that AZZ was not perfect and "may have missed one or two[,]" but once found, they remediated it. On May 10, 2017, STI's Glaser asked for AZZ's response about the pipe defects, and on May 11, 2017, McKinney responded on "AZZ Galvanizing Beaumont" letterhead explaining his position. The letter notes that most problems are on the pipe's interior diameter, and none are on the outside diameter. He attributes the problems to the pipe's design with multiple connections

34

and to insufficient blasting before galvanizing. McKinney said his position has not changed since sending the letter.

McKinney said that to the best of his knowledge, AZZ did not threaten to stop work unless STI agreed to the June 6, 2017, email, which AZZ referred to as the "moving forward agreement." He claimed that AZZ was already remediating spools at that time. He also discussed Duran's July 2017 report, which identified four categories of deficiencies and recommended corrective action.

McKinney testified that STI "hired AZZ" to do the job, and to speed up the remediation process, they sent work to Houston, San Antonio, and West Houston. McKinney also agreed that AZZ is the largest galvanizer in North America and is publicly traded.

**Testimony of Bernardo Duran**

The video deposition of Bernardo Duran was played for the jury. Duran discussed his work experience and LinkedIn profile which was shown to the jury with his video deposition. He testified that he worked as a technical sales manager for AZZ Galvanizing in 2013, then he became a coating performance engineer with AZZ Incorporated in March 2015. He worked at AZZ's corporate office in Fort Worth and served as technical support for AZZ's plants nationwide. Duran left AZZ in 2018 for another job.

35

Duran became involved in the STI project in 2017, after AZZ completed the original galvanization work. Duran gave AZZ a "6 or 7" rating out of a possible 10 for this project, and a 9 or 10 for earlier stages. According to Duran, once STI raised complaints, AZZ made "intense efforts" to address them, and the regional manager and vice presidents were involved.

Duran testified that ASTM A123 applied to this job, including the inside and outside of the pipe spools, but he did not know what other specifications Bechtel's contract required. As one of the largest galvanizers in the country, Duran expected AZZ to be a subject-matter expert in galvanizing.

Duran discussed his April 26, 2017, email, in which he told other AZZ personnel that the small bare spots must be touched up per ASTM A123 to meet the specification requirements, and if the areas are inaccessible for that, they must be regalvanized. Duran testified that ASTM A123 outlined an inspection process by lot, and while it did not contain a rate that was "acceptable" for rejection, it provided a number per lot that should be tested. Per ASTM A123, AZZ would not check every piece. He explained that Bechtel and STI did not want any debris at all inside the pipe, but ASTM A123 does not require that. Duran felt there was a problem with the customer's understanding of what is reasonable and expected in the galvanizing process, but it was not a galvanizing problem. He did not feel AZZ was responsible

36

for bare spots on the interior diameter of the pipe only visible with a borescope, because that was not a naked-eye inspection, thus it was beyond ASTM A123.

Duran testified that the Beaumont plant felt that some pipes had been insufficiently abrasively blasted, which caused the bare spots, but he did not recall seeing that specifically. Duran said his job was to try to make the customer happy; if there was something rejectable, he wanted to get it remedied, and if it was not rejectable, he wanted to help the customer understand why it was not rejectable. He believed that STI and Bechtel wanted a higher standard than ASTM A123 required.

The proposal that AZZ be responsible for the straight runs and STI would be responsible for regalvanizing the bends was an effort to keep the customer happy. AZZ was willing to help, but some of this was not their responsibility, and he felt some of STI's requests were unreasonable. Duran testified there were misunderstandings by the project inspectors, as some rejected pipe that others accepted.

On July 5, 2017, Duran prepared a report summarizing his site visit for STI and Bechtel. He testified that his report noted variances, including active corrosion and inclusions, which do not conform to ASTM A123. Duran agreed that areas visible to the naked eye can be a proper basis for rejection of AZZ's galvanizing work. He also stated in his report that most problems were on the pipe's interior diameter but not the outer diameter, which indicated the quality issue was not caused

by the processing chemicals; if that were the case, you would expect problems on the outer diameter of the pipe. He testified that his report listed several corrective actions and testified those were to "appease Bechtel and STI."

**Other Testimony**

STI's retained experts included licensed professional engineer Wesley Oliphant, metallurgist Robert Iezzi (as noted and discussed briefly above), and CPA Dan Clark. Oliphant and Iezzi discussed the applicable galvanizing standards and deficiencies in the original galvanizing, while Clark addressed STI's alleged damages. AZZ's retained experts included financial expert David Fuller, who disputed STI's damages, and galvanizing expert Michael O'Brien, who discussed the applicable ASTM standards. Bechtel's Lead Piping Engineer for Stage 3 of the Sabine Pass Project, Ole Madsen, also testified. Madsen discussed the standard he felt applied to this galvanizing work, which contradicted other witnesses' testimony. He discussed the Deficiency Reports and Non-Conformance Reports he prepared for the pipe at issue, along with the defects he observed in the pipe spools.

**Documentary Evidence**

Thousands of pages of documents were admitted at trial, some of which we have already addressed in our discussion of the witnesses' testimony, so we will not describe again here. The admitted documents included Stage 3 purchase orders issued by STI for the original galvanizing. Some purchase orders listed

"International Galvanizers" as the vendor and others listed "Aztec Galvanizing" as the vendor. Additionally, invoices from the original galvanizing work were admitted into evidence issued by AZZ Galvanizing Services to STI and said that payment should be remitted to "International Galvanizers." Various bills of lading and multiple "AZZ Galvanizing Services Visal Inspection Check List" documents were also admitted into evidence.

An email sent by Wright, the AZZ Beaumont Plant Manager, on May 9, 2017, to Glaser discussed rerunning pipe spools and had the same signature block previously noted. In the email, Wright asks Glaser or Garrett to look at the regalvanized pipes, because "I don't want AZZ Beaumont to be responsible for these pipes as Bechtel receives them." Wright's June 6, 2017, email contained the same signature block and logo as his previous email and noted that AZZ would reprocess the pipes. Wright added that STI would be responsible for the cost of reprocessing the pipes with 90-degrees or bends, while "AZZ Beaumont would be responsible" for reprocessing the straight pipes with bare spots.

The "AZZ Galvanizing Services Quality Program Manual" sent by Netherland along with a cover letter attached as an addendum listed all galvanizing facilities. As discussed by Iezzi, it lists "Key Personnel" as including: Senior Vice President, Galvanizing Services; the Galvanizing Divisional Vice President; the Galvanizing Regional Manager; the Galvanizing Plant Manager; and the Plant

Superintendent. It does not suggest that any of these individuals is employed by AZZ, Inc. rather than "AZZ Galvanizing Services."

## Motion for Directed Verdict

After STI rested, the Defendants moved for directed verdict on STI's claims. The trial court granted a directed verdict on STI's "alter ego" claims but denied Defendants' motion for directed verdict on STI's other claims. With respect to the contract, the Defendants argued there was no evidence of who had the contract and whether that was AZZ, Inc. or International Galvanizers, which was STI's burden to prove but it failed to do so. In response to Defendants' motion for directed verdict, STI represented that Glaser, Gill, and Spence testified that "an agreement existed from (sic) galvanization with AZZ, Inc." STI also pointed to its Exhibits 4, 6, and 7, which were the specifications for each project and the documents from Netherland sending the AZZ Galvanizing Quality Manual.

## Jury Charge and Verdict

With respect to STI's breach of contract and breach of warranty claims, STI asked the trial court to define "AZZ" in the jury charge solely as "AZZ, Inc." Defendants objected repeatedly to this definition, explaining that the trial court "heard nothing about the entity AZZ, Inc., in this entire trial[,]" and arguing again that AZZ, Inc. is a separate corporate entity from the AZZ-Beaumont entity. Additionally, Defendants reminded the trial court that it had already granted the

40

directed verdict on STI's alter ego claim, and that STI "was trying to make an end run around their failure to prove agency, joint venture, alter ego, or piercing the corporate veil claims." Despite the Defendants' repeated objections to defining "AZZ" to mean "AZZ, Inc." and the trial court acknowledging that "no one's ever broke[n] down the corporate structure," the trial court accepted STI's definition and included the following definitions in its jury charge:

> "AZZ" refers to Defendant AZZ Inc. a/k/a AZZ Incorporated.

> "AZZ Galvanizing – Beaumont" refers to International Galvanizers LLC d/b/a AZZ Galvanizers and d/b/a AZZ Galvanizing – Beaumont and f/k/a International Galvanizers Partnership, Ltd.

The trial court then submitted as Question 1, "Did STI and AZZ agree that AZZ would galvanize pipe spools provided by STI?" The jury answered "Yes" to that question. The jury found that AZZ breached the contract and an express warranty.[6] It then awarded the same amounts of damages for each cause of action, $4,539,468.25.

**Trial Court's Judgment**

STI filed a Motion for Entry of Judgment and elected to recover on its breach of contract claim. Among other things, STI requested its attorney's fees through trial,

---

[6]The jury rejected International Galvanizers LLC's counterclaim for breach of contract related to the regalvanization, and answered "No" to Question 4, but AZZ-Beaumont did not appeal that finding.

post-trial, and on appeal. The trial court entered its Final Judgment solely against

AZZ, Inc. and awarded STI the following:

1. Actual damages in the principal amount of $4,539,468.25;

2. Attorney's fees incurred through October 2023 in the amount of $950,558.50;

3. Attorney's fees of $56,850.00 for post-trial matters expected to be performed on behalf of STI at the trial court level before the Court's plenary power expires;

4. Pre-judgment interest of $2,414,499.63, representing interest on STI's principal damages of $4,539,468.25 at a rate of eight- and one-half percent (8.5%) per annum calculated as simple interest from October 24, 2017 until the day before this judgment is signed;

5. Post-judgment interest of on all of the above at the rate of eight and one half percent (8.5%), compounded annually, from the date this judgment is signed until all amounts are paid in full.

6. Contingent attorney's fees in the amount of $149,250.00 recoverable if there is an appeal to the intermediate court of appeals and STI ultimately prevails on appeal;

7. Contingent attorney's fees of $69,000.00 if a petition for review is filed with the Texas Supreme Court and STI ultimately prevails; and

8. Contingent attorney's fees of $82,500.00 if the Texas Supreme Court grants a petition for review and requests briefing on the merits and STI ultimately prevails on appeal.

9. Post-judgment interest of eight and one half percent (8.5%) on contingent attorney's fees from the date this judgment is made final by the appropriate appellate court's judgment until this judgment is fully paid.

**Defendants' Post-Trial Motions**

AZZ, Inc. and the other Defendants filed a Motion for New Trial challenging the factual sufficiency of the evidence and a Motion for Judgment Notwithstanding the Verdict challenging the legal sufficiency of the evidence to support any liability finding against AZZ, Inc., including the jury's answer to Question 1, among others.

They complained, among other things, that the trial court defined "AZZ" to mean "AZZ, Inc." in its charge. They argued no evidence supported the jury's adverse liability findings against "AZZ, Inc.," and stated that instead "AZZ Galvanizing – Beaumont" was the correct legal entity who had agreed to galvanize (and regalvanize) pipe spools for STI. These motions were overruled by operation of law.

### III. ISSUE ONE: SUFFICIENCY OF THE EVIDENCE AND EXISTENCE OF AN AGREEMENT

In its first issue, AZZ, Inc. contends the evidence is legally and factually insufficient to support the jury's answer to Question 1. In Question 1, the jury found that STI and AZZ, Inc. agreed that AZZ, Inc. would galvanize pipe spools provided by STI. AZZ, Inc. is the only defendant against whom STI obtained a judgment, and it is the only defendant from whom STI sought a verdict under the charge. On appeal, AZZ, Inc. argues there is no evidence that anyone at either AZZ Beaumont or AZZ Houston had authority to contract for AZZ, Inc., nor is there any evidence that shows a contract between STI and AZZ, Inc.

We address the legal sufficiency argument raised in this issue first since, if sustained, it would result in rendition in favor of AZZ, Inc. *See* Tex. R. App. P. 43.3 (discussing rendition), 47.1 (requiring appellate court to hand down and opinion as brief as practicable); *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981) (instructing that "no evidence" points should be reviewed first). The existence of a valid contract is an essential element of a breach of contract claim, and without

43

it, a party's claim for breach fails. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (citations omitted) (noting first requisite element of breach of contract claim is the existence of a valid contract).

**Waiver**

To begin, we address STI's argument that AZZ, Inc. waived its sufficiency-of-the-evidence challenge to liability by framing its issue on appeal as attacking the evidence supporting a "Stage 3" contract neither found by the jury nor incorporated into the judgment and by not attacking the jury's "no" answer to the existence of a Stage 3 contract. STI focuses on AZZ, Inc.'s use of "Stage 3" in the framing of its issue.

"[B]riefing waiver is generally disfavored[,]" and we should reach the merits of an appeal whenever possible. *Gill v. Hill*, 688 S.W.3d 863, 869 (Tex. 2024) (citations omitted). A "statement of an issue or point" in an appellate brief "will be treated as covering every subsidiary question that is fairly included." Tex. R. App. P. 38.1(f). We construe briefs liberally but reasonably so the right to appeal is not lost by waiver. *See Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732 (Tex. 2020) (quoting *Horton v. Stovall*, 591 S.W.3d 567, 569 (Tex. 2019) (per curiam)) (other citation omitted). In addition to the wording of the parties' issues, we look to their "arguments, evidence and citations" to determine what "the parties intended to and actually briefed." *Id.* at 733 (citations omitted).

44

In its first issue presented, AZZ, Inc. contends that a breach-of-contract claim requires proof of a contract, "which in the context of entities, requires proof of an agreement for the entity by an agent with authority." Appellant also asserts that "STI offered no evidence that anyone had authority to bind AZZ, Inc. to do the 'Stage 3' galvanization work, or that any contract existed between AZZ, Inc. and STI for the Stage 3 work." AZZ, Inc.'s briefing outlines factual allegations and authorities challenging the legal sufficiency of the evidence to support the existence of an agreement, and asserts that no evidence established AZZ, Inc. was the party who had an agreement with STI to galvanize the pipe and that AZZ, Inc. is in fact a separate and distinct legal entity from AZZ-Beaumont who had an agreement with STI. The evidence in the record shows, and the briefing explains, that the "agreement" the jury was asked about dealt with galvanization of Stage 3 work for the two projects at issue. Indeed, as AZZ, Inc. explains in its brief, the Bechtel projects proceeded in stages, and the record shows that the witnesses consistently testified that there were no issues with the galvanizing done for Stages 1 and 2. AZZ, Inc. cites to Bechtel's purchase orders and specifications in the record to likewise support that the work moved in "stages," and the issues regarding the galvanization work only pertained to the Stage 3 work. Additionally, AZZ, Inc. cites multiple authorities addressing: legal sufficiency challenges; the existence of a valid agreement as a necessary element of a breach-of-contract claim; the necessity of evidence showing someone

45

had authority to bind a corporation; and how the equal inference rule applies in this situation involving entities that share overlapping names and means no evidence supports that the entity AZZ, Inc. agreed to galvanize the pipe at issue, which was the Stage 3 pipe.

Looking to the wording of the issues, "arguments, evidence and citations" in AZZ, Inc.'s brief, we conclude AZZ, Inc. did not waive its legal sufficiency challenge to the evidence supporting the jury's finding that STI and AZZ, Inc. agreed that AZZ, Inc. would galvanize pipe spools provided by STI. *See id.* at 732–33. We now address the merits of AZZ, Inc.'s legal sufficiency challenge to the evidence supporting the jury's affirmative finding that AZZ, Inc. and STI agreed that AZZ, Inc. would galvanize pipe provided by STI. *See Gill*, 688 S.W.3d at 869.

**Standard of Review and Applicable Law**

A party challenging the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof at trial must demonstrate no evidence supports the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011); *see also Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). When reviewing legal sufficiency, we credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it enables fair-minded people to reach the

verdict under review. *Id.* We consider all the evidence "'in the light most favorable to the party in whose favor the verdict has been rendered,'" and "'every reasonable inference deducible from the evidence is to be indulged in that party's favor[.]'" *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). As the sole judges of the witnesses' credibility and the weight to give their testimony, the jury may choose to believe one witness and disbelieve another. *City of Keller*, 168 S.W.3d at 819.

> We will sustain a legal sufficiency challenge when the record confirms either:
>
> (a) complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact.

*Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (citing *City of Keller*, 168 S.W.3d at 819); *see also Crosstex N. Tex. Pipeline, LP v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016) (citations omitted). "Evidence is more than a scintilla if it 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011) (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)). Evidence that "does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess, then it is no evidence." *Id.* We presume

jurors made all inferences in favor of the verdict, but only if reasonable minds could. *Id.*

"Jurors may not simply speculate that a particular inference arises from the evidence." *Id.* (citing *City of Keller*, 168 S.W.3d at 821). Under the equal inference rule, "a factfinder 'may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than the other.'" *Graham Cent. Station*, 442 S.W.3d at 265 (quoting *Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013)) (concluding evidence was legally insufficient). In such cases, we view each piece of circumstantial evidence considering all the known circumstances and not in isolation. *City of Keller*, 168 S.W.3d at 813–14 (citation omitted).

When an element of a claim is omitted from the jury charge without objection and the trial court makes no written findings on that element, then the omitted element is deemed to have been found by the factfinder in support of the judgment. *See* Tex. R. Civ. P. 279; *Guerra*, 348 S.W.3d at 228–29. As with any other finding, there must be evidence to support a deemed finding. *See Guerra*, 348 S.W.3d at 229.

A party alleging a breach of contract claim must establish the existence of a valid contract. *See TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 464–65 (Tex. 2018); *Menchaca*, 545 S.W.3d at 501 n.21; *Akhtar v. East Tex. Truss,*

48

*LLC*, No. 09-23-00287-CV, 2025 WL 2798554, at *6 (Tex. App.—Beaumont Oct. 2, 2025, pet. denied) (mem. op.) (noting as party with the burden of proof, plaintiff must prove each element of breach-of-contract action by a preponderance of the evidence). In Texas, a corporation may act only through its agents. *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 762 (per curiam). "Texas law does not presume agency, and the party who alleges it has the burden of proving it." *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007) (citing *Buchoz v. Klein*, 184 S.W.2d 271 (Tex. 1944)). An agent cannot bind a principal without either actual or apparent authority. *DB Sterling Invs., L.P. v. Pro M & E, Inc.*, No. 09-08-00381-CV, 2009 WL 2045307, at *3 (Tex. App.—Beaumont July 1, 2009, pet. denied) (mem. op.); *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 913 (Tex. App.—Dallas 2008, no pet.). An agent's authority to act on a principal's behalf "depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007) (citation omitted). Apparent authority is based on estoppel, arising "'either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions" that lack "such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise.'" *Id.* (quoting *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). Only the principal's conduct is

relevant to determining whether apparent authority exists. *Id.* Thus, courts examine the principal's conduct and the reasonableness of the third party's assumptions about authority. *Id.* at 183.

"Texas law presumes that two separate corporations are indeed distinct entities[.]" *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002) (discussing in the context of jurisdictional analysis); *TPC Grp. Litigation*, No. 09-22-00159-CV, 2024 WL 3197475, at *15 (Tex. App.—Beaumont June 27, 2024, no pet.) (mem. op.). Thus, a party seeking to disregard the distinct corporate entities to ascribe one's acts to the other must prove that the two entities are not separate. *See BMC Software Belg.*, 83 S.W.3d at 798; *TPC Grp. Litigation*, 2024 WL 3197475, at *15. Courts are generally more reluctant to disregard the corporate entity in breach of contract cases than in tort cases. *See Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 375 (Tex. 1984) (citation omitted).

**Analysis**

The trial court instructed the jury that when the charge uses the name "AZZ" it "refers to Defendant AZZ, Inc. a/k/a AZZ Incorporated." STI had the burden to prove by a preponderance of the evidence that AZZ, Inc. and STI agreed that AZZ, Inc. would galvanize pipe for these projects. *See TRO-X, L.P.*, 548 S.W.3d at 464–65; *Menchaca*, 545 S.W.3d at 501 n.21; *Akhtar*, 2025 WL 2798554, at *6. The law requires us to presume that AZZ, Inc. and International Galvanizers LLC d/b/a AZZ

Galvanizers and d/b/a AZZ Galvanizing – Beaumont and f/k/a International Galvanizers Partnership, Ltd. are separate and distinct legal entities. *See BMC Software Belg.*, 83 S.W.3d at 798; *TPC Grp. Litigation*, 2024 WL 3197475, at \*15. Here, before the case was submitted to the jury, the trial court granted Defendants' motion for directed verdict on the alter ego theory, which meant that the trial court found no evidence existed showing these entities could be fused for liability purposes. *See BMC Software Belg.*, 83 S.W.3d at 798; *TPC Grp. Litigation*, 2024 WL 3197475, at \*15. STI did not challenge the directed verdict by cross-appeal.

As a corporation, AZZ, Inc. could act only through an agent. *See In re Vesta Ins. Grp., Inc.*, 192 S.W.3d at 762. Agency is not something we presume, and STI had the burden of proving it. *See Gaines*, 235 S.W.3d at 182. There was no objection to the court's charge on the basis that it omitted a question that an agent of AZZ, Inc. agreed to bind the company, so the issue is "deemed found by the court in such manner as to support the judgment." *See* Tex. R. Civ. P. 279; *Guerra*, 348 S.W.3d at 228–29. That said, there still must be evidence in the record to support the deemed finding of agency. *See Guerra*, 348 S.W.3d at 229. There must be evidence that an agent of AZZ, Inc. with the authority—actual or apparent—to bind the company agreed to galvanize the pipe at issue. *See id.*; *see also Gaines*, 235 S.W.3d at 182; *DB Sterling Invs.*, 2009 WL 2045307, at \*3. As the principal, we look only at AZZ, Inc.'s conduct leading a third party to believe Bond or Netherland had an agency

51

relationship. *See Gaines*, 235 S.W.3d at 182; *DB Sterling Invs.*, 2009 WL 2045307, at *3.

Evidence that an agent of International Galvanizers LLC d/b/a AZZ Galvanizers and d/b/a AZZ Galvanizing – Beaumont and f/k/a International Galvanizers Partnership, Ltd. agreed to galvanize pipe is not evidence that AZZ, Inc. agreed to galvanize pipe. Yet that is what this jury concluded. To do so, evidence must exist in the record to justify a reasonable inference, and not simply speculation, that testimony regarding "AZZ" meant "AZZ, Inc." since evidence that "does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess," is no evidence. *See Guerra*, 348 S.W.3d at 228. The jury determined that "AZZ, Inc." agreed to galvanize pipe provided by STI in this case. To do so, the jury was required to infer that testimony regarding "AZZ" or as STI characterizes it, "big AZZ" meant "AZZ, Inc." The jury cannot simply speculate that a particular inference arises from the evidence. *See id.*; *see also City of Keller*, 168 S.W.3d at 821.

Glaser testified that he reached out to "AZZ" to quote galvanizing given their proximity in Beaumont, that they had multiple locations nationwide, and "they're essentially the biggest game in town." Contrary to STI's representations in the charge conference, Glaser did not testify it was "AZZ, Inc." that he asked to quote the job. Rather, a careful review of Glaser's testimony reveals that he did not specify

a particular "AZZ" entity. There is some evidence that Netherland and Bond sent specifications to STI for the original pipe galvanization, both on separate "AZZ Galvanizing Services" letterhead that acted as an addendum to the "AZZ Galvanizing Services Quality Program Manual." In 2015, Netherland sent a copy of the manual to STI regarding an inquiry for pipe galvanization on these projects, which Bechtel stamped "Code 1." The manual lists all the galvanizing plants, which STI asserts supports the notion "big AZZ" meant "AZZ, Inc." that owned all these facilities.

This is problematic on multiple fronts. STI introduced no evidence at trial that suggested either Netherland or Bond worked for AZZ, Inc. when they responded to STI's galvanizing inquiry with the manual and galvanizing procedure. Indeed, the letterhead, while not dispositive, said that the specifications were being forwarded on behalf of "AZZ Galvanizing Services" and in Netherland's case, "AZZ Galvanizing – Beaumont" both purportedly d/b/as of "International Galvanizers, LLC," although there was no clear evidence of the d/b/a status admitted at trial either. The title of the Quality Program Manual likewise does not show that it was a product of AZZ, Inc., rather it was titled "AZZ Galvanizing Services Quality Program Manual." Nor did Glaser testify that he understood Bond or Netherland to be acting as agents of AZZ, Inc.

STI also urges us to consider the fact that the manual lists organization charts showing Senior Vice President and not the Plant Manager has the responsibility to "plan, implement and maintain the Quality Program." Iezzi's testimony briefly addressed various roles as listed in the "AZZ Galvanizing Services Quality Program Manual." We agree that the Quality Program Manual says as much, but the manual does not reflect that the Senior Vice President mentioned is a Senior Vice President for AZZ, Inc. rather than a Senior Vice President for "AZZ Galvanizing Services." STI also points to the fact that Bernardo Duran, a metal coatings engineer employed by AZZ, Inc. became involved in April 2017, after the original galvanizing work was done for these stages of the projects, to provide recommendations for remediation and that Duran sent his report to "AZZ Vice President Mike Delesandri, AZZ Southeast Regional Manager Bobby McKinney, and AZZ Regional Sales Manager Kevin Houston." STI contends these "AZZ representatives, along with Beaumont personnel, were 'directly involved with the project.'"

Except for Duran, nothing in the record shows that any of these individuals were employed by AZZ, Inc. rather than another AZZ entity. In fact, the only evidence in the record showing any link to AZZ, Inc. was that it employed Duran, a technical expert who offered support services to all plants, and who had nothing to do with the formation of any agreement. Another important note of context shows

that before becoming a coatings engineer for "AZZ Incorporated," Duran was a technical sales manager for "AZZ Galvanizing."

At trial, Glaser testified about STI's communications with AZZ and Bechtel regarding the problems with the pipes and the plan for fixing them. This included communications with Houston from AZZ, who was a "regional sales" person and "heavily involved." That said, Glaser did not specify which entity Houston was a regional salesperson for—whether AZZ, Inc. or some other AZZ entity. The record shows that Wright was the Beaumont plant manager during the regalvanization process. On his June 6, 2017, email proposing who would bear the financial cost for regalvanizing the pipe, an AZZ, Inc. logo appears under his signature block. Even so, he signed the email as the plant manager of "AZZ Galvanizing – Beaumont," which is a d/b/a of "International Galvanizers." When Glaser was asked whether Garrett's response to Wright's email constituted a new agreement, Glaser responded, "It's just the tracking of the information on these two jobs." Gill and Spence provided similar testimony denying any agreement based on Wright's June 6, 2017, email.

STI directs us to documents in the record, including a "valued vendor letter" sent by Gill to the attention of Houston, but it notes "AZZ Galvanizing" is the vendor not AZZ, Inc. Likewise, none of the purchase orders, invoices, or STI's own Job Detail Reports list AZZ, Inc. Rather, the original galvanization purchase orders and

invoices list "International Galvanizers" as the vendor who performed the work. While McKinney agreed under cross-examination that AZZ was the largest galvanizer in North America and publicly traded, he did not specify that "AZZ" was "AZZ, Inc." That McKinney may have used "AZZ" to mean "AZZ, Inc." in this context is not evidence and does not give rise to a reasonable inference that his other references to "AZZ" in other contexts meant "AZZ, Inc." Testimony that AZZ, Inc. is a large, publicly traded company is not testimony that AZZ, Inc., agreed with STI to galvanize pipe spools for STI on these projects. STI introduced no evidence of the corporate structure, how AZZ, Inc. was involved, or how that entity was related to "International Galvanizers" or any d/b/a. Nor did the record show that AZZ, Inc. communicated to the individuals involved or to STI that Bond or Netherland were its agents who had authority to agree that AZZ, Inc. would galvanize pipe. *See Gaines*, 235 S.W.3d at 182. There was no evidence that AZZ, Inc. employed Netherland, Bond, McKinney, Houston, or Delesandri, individuals who STI point to as being "directly involved" in the Bechtel projects, or that anyone acting on behalf of AZZ, Inc. rather than some other related entity, had authority to act.

Jurors in this case inferred that testimony regarding "AZZ" meant "AZZ, Inc.," and that the individuals who agreed to the galvanizing specifications had authority to act as agents of AZZ, Inc. These were ultimate facts drawn from meager circumstantial evidence which could give rise to any number of inferences such that

56

no inference was more probable than another. *See Graham Cent. Station*, 442 S.W.3d at 265 (quoting *Hancock v. Variyam*, 400 S.W.3d at 70–71) (concluding evidence was legally insufficient). Here, given the meager circumstantial evidence viewed in context, testimony referring to "AZZ" could just as easily have meant "International Galvanizers LLC d/b/a AZZ Galvanizers and d/b/a AZZ Galvanizing – Beaumont and f/k/a International Galvanizers Partnership, Ltd." as "AZZ, Inc." *See id.* Viewing each piece of circumstantial evidence considering all the known circumstances and not in isolation, we conclude that the jury violated the equal inference rule when it determined that STI and AZZ, Inc. agreed that AZZ, Inc. would galvanize pipe spools provided by STI. *See City of Keller*, 168 S.W.3d at 813–14; *see also Graham Cent. Station*, 442 S.W.3d at 265 (concluding that inference witness was employed by specific entity where he testified he was paid by "Graham Central Station without specifying "Graham Central Station, Inc." or "Pharr Entertainment Complex, L.L.C. d/b/a Graham Central Station," violated equal inference rule given lack of specificity); *Guerra*, 348 S.W.3d at 229–31 (determining inferences were equal and the presence of a company logo on the documents was legally insufficient to support a finding that individual was employed by a particular entity); *BMC Software Belg.*, 83 S.W.3d at 800 (concluding use of letterhead containing "BMC Software" by two corporations was no evidence that the corporations failed to observe corporate formalities in context of jurisdiction);

*All Star Enters., Inc. v. Buchanan*, 298 S.W.3d 404, 423–24 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (explaining that under the equal inference rule, where the names of several affiliated companies began with "Antero Resources," invoices addressed to "Antero Resources" were no evidence that the vendors were referring to a particular company).

The evidence in this case does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess that an agent authorized to bind AZZ, Inc., a distinct legal entity, agreed on behalf of AZZ, Inc., with STI to galvanize pipe, so it is no evidence. *See Guerra*, 348 S.W.3d at 228; *City of Keller*, 168 S.W.3d at 813–14. Thus, we hold the evidence was legally insufficient to support the jury's finding that STI and AZZ, Inc. agreed that AZZ, Inc. would galvanize pipe spools provided by STI. *See City of Keller*, 168 S.W.3d at 813–14; *see also Graham Cent. Station*, 442 S.W.3d at 265; *Guerra*, 348 S.W.3d at 229–31; *BMC Software Belg.*, 83 S.W.3d at 800; *All Star Enters.*, 298 S.W.3d at 423–24. We sustain issue one.

## IV. CONCLUSION

We have sustained issue one because we conclude the evidence was legally insufficient to support the jury's finding that STI and AZZ, Inc. agreed that AZZ, Inc. would galvanize the pipe at issue. Accordingly, we find it unnecessary to address AZZ, Inc.'s remaining issues. *See* Tex. R. App. P. 47.1. We reverse the trial

58

court's judgment and render judgment that STI take nothing by way of its claims against AZZ, Inc. *See id.* 43.3; *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 929 (Tex. 2009) (explaining that reversal and rendition is appropriate when appellate court holds there is legally insufficient evidence to support a judgment after a trial on the merits).

REVERSED AND RENDERED.

W. SCOTT GOLEMON
Chief Justice

Submitted on March 5, 2026
Opinion Delivered April 9, 2026

Before Golemon, C.J., Johnson and Wright, JJ.